CLERK'S OFFICE
A TRUE COPY
Jul 28, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
information associated with info@investorscapitalllc.net, which is stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043

Case No. 25-M-477 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 8-11-25 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. X at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______.

Date and time issued: 7-28-25. 9:45 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following accounts, which are stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043:

1. **info@investorscapitalllc.net**

# ATTACHMENT B

## Particular Things to be Seized

**I. Information to be disclosed by Google, LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Google, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for the account or identifier listed in Attachment A **for the time period of April 25, 2022, through the date of this warrant.**

a. The contents of all emails associated with the accounts, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email, the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c. The types of service utilized;

d. Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

e. Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

f. The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

g. The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

h. The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

i. All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history;

j. All Google Voice records associated with the account, including: forwarding and other associated telephone numbers, connection records; call detail records; SMS and MMS messages, including draft and deleted messages; voicemails, including deleted voicemails; user settings; and all associated logs, including access logs, IP addresses, location data, timestamps, and change history;

k. All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

l. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

m. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

Google is hereby ordered to disclose the above information to the government within 14 days of the issuance of the warrant.

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) involving Joseph Nantomah, Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC, from April 25, 2022, through the date of this warrant, for the Subject Account identified in Attachment A, information, including records and communications, pertaining to the following matters:

1. Offering, soliciting, or discussing of investment opportunities;
2. Obtaining, secreting, transferring, and/or concealment of money and other assets, and the expenditure of money;
3. Personal and business accounting books and records: ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all

sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

4. Personal and business financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates, US Treasury notes or bills, cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;
5. Business origination and creation documentation;
6. Titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, wills, inheritance records, gift records, trust records, records for the purchase of precious metals, and other investment records;
7. Client records including names, address and telephone books, work orders, notes, investment agreements, contracts, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

8. Online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;
9. All evidence of who created, used, owned or controlled the Subject Account, including, records that help reveal the identity and whereabouts of such person(s).
10. Evidence indicating how and when the Subject Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owners.
11. Evidence indicating the Subject Account owners' state of mind as it relates to the crime under investigation.
12. The identity of the person(s) who communicated with the Subject Account about matters relating to the above-mentioned violations, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Jul 28, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

information associated with info@investorscapitalllc.net, which is stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043

Case No. 25-M-477 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the __________ District of __________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, U.S.C. § 1343 | Wire Fraud |
| Title 18, U.SC. §§ 1956 and 1957 | Money Laundering |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Hailey Wirtz, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7-28-25

[signature]
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Hailey Wirtz, being first duly sworn, hereby depose and state as follows:

## BACKGROUND AND EXPERIENCE OF AFFIANT

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Google, LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California. The Google account to be searched is **info@investorscapitalllc.ne**t ("Subject Account"), which is further described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information(including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since January 2025. As a Special Agent, I've received training in complex financial crimes, including the identification, investigation, and documentation of fraudulent financial activity. This training includes instruction of how email accounts can be utilized to support financial crime investigations and identify patterns of misconduct.

3. The statements in this affidavit are based on my personal observations, my training and experience, information obtained from other federal and state investigators, witness statements and records, other third-party records, and information published by Google. I believe these sources of information to be credible and reliable based on the corroboration of the information

and my experience with these matters. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined in 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5. As set forth below, there is probable cause to believe that in the Subject Account are the fruits, evidence, and instrumentalities of criminal offenses in violation of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) ("the Subject Offenses").

**Background of the Investigation**

6. Beginning in February 2025, the Federal Bureau of Investigations (FBI) and Internal Revenue Service, Criminal Investigation (IRS-CI) started investigating allegations that Joseph Nantomah defrauded numerous investors in a fix-and-flip real estate investment scheme between 2020 and 2024 through his companies Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC. A fix-and-flip real estate investment involves investors purchasing properties in need of repair, renovating them, and then selling them for a profit. Based on the investigation to date, Nantomah solicited fix-and-flip real estate investments from individuals who attended his presentations at financial coaching classes

and seminars, and through social media. Nantomah entered into written investment agreements with investors, promising to use the invested funds to acquire properties, fix them up, flip them, and pay the investors their principal with a guaranteed return on investment on a specific date. Based on the investigation to date, Nantomah did not use the money he received to purchase properties or to fix them. Instead, Nantomah used those funds on personal expenses and Ponzi payments to prior investors.

7. During this investigation, case agents learned that the Securities and Exchange Commission (SEC) and Wisconsin Department of Financial Institutions, Bureau of Enforcement, Division of Securities (WI-DFI), have both been conducting their own multi-year investigations into Nantomah's fix-and-flip real estate investment scheme. The SEC and WI-DFI investigations have involved interviewing and gathering records from victim investors and analyzing financial records relating to Nantomah and his businesses. The SEC and WI-DFI have provided the case agents with access to their investigative files, which contain: (1) investor interview recordings, transcripts, and memorandums, (2) investor files containing records such as investment agreements, communications with Nantomah, complaints, and financial records, (3) records subpoenaed from financial institutions, and (4) bank record analysis. These investigative files are referenced throughout this affidavit.

8. During this investigation, case agents also learned that numerous victim investors from across the United States hired the Milwaukee law firm, AxePoint Law, to assist them with filing state and federal complaints against Nantomah and his businesses in Milwaukee, WI. AxePoint Law provided the case agents with their clients' filed complaints and exhibits, the recording and transcript of a deposition AxePoint Law took of Nantomah on September 19, 2024,

and records subpoenaed from financial institutions. These files are referenced throughout this affidavit.

**Nantomah's Businesses**

9. Investors Capital LLC (IC) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 1, 2020. WI-DFI records show that Nantomah is the registered agent and sole member of IC, and the principal office address is at 790 N Milwaukee Street, Suite 354, Milwaukee, WI 53202. In Nantomah's AxePoint Law deposition on September 19, 2024, he said the business purpose of IC was to buy and sell real estate.

10. Global Investors Capital LLC (GIC) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 10, 2022. WI-DFI records show that Nantomah is the registered agent and sole member of GIC, and the principal office address is at 11220 W Burleigh Street, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said GIC was a holding company setup to hold rental real estate. He said that properties were purchased by IC and transferred to GIC if they were held for rental purposes.

11. Wealth Flow LLC (WF) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 1, 2022. WI-DFI records show that Nantomah is the registered agent and sole member of WF, and the principal office address is at 11220 W Burleigh Street, Suite 100, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said it is his company that he used for seminars, conferences, and boot camps, to teach people how to acquire profitable real estate, how to build wealth through real estate, setting up LLCs, and building business credit. Nantomah said they would scout properties during WF classes and he would do real estate deals with individuals from the WF classes.

12. High Income Performance Partners LLC (HIPP) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on July 14, 2023. WI-DFI records show that Nantomah is the registered agent and the principal office address is at 11220 W Burleigh Street, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said HIPP was created to differentiate between the students and partners who took the WF class. Nantomah said HIPP was created as an education class for partners who had real estate experience and were willing to move forward with investments, while the students with no real estate experience were part of the WF class.

**Financial Analysis of Investments**

13. During this investigation, case agents analyzed multiple personal and business bank account records pertaining to accounts controlled by Nantomah. These account records were obtained through subpoena and through the WI-DFI and SEC. Case agents also analyzed numerous investment agreements, complaints, and interview records obtained from the WI-DFI, SEC, and AxePoint Law. These records show that from approximately May 4, 2020 until January 12, 2024, at least 32 individuals and businesses invested at least $1,929,000 with IC, GIC, and HIPP. The bank account records show Nantomah used a significant amount of these funds for a variety of expenditures unrelated to the purchase, renovation, and sale of properties as promised in the investment agreements. Instead, Nantomah spent a significant amount of these funds at companies associated with the sale of vehicles, boats, jewelry, golden visa and other residency and citizenship programs, travel, and for large American Express credit card payments for apparent lavish personal expenses including travel and jewelry, among other things.

**Investment Property at 3985 Fairfield Road, Slinger, Wisconsin 53086**

14. In May and June 2023, four individuals, identified herein as Investor 1, Investor 2, Investor 3, and Investor 4, invested a combined $290,000 with IC to fix-and-flip a residential property at 3985 Fairfield Road, Slinger, Wisconsin 53086. AxePoint Law represents these investors. AxePoint Law provided records showing each of these investors entered into Investment Agreements with IC. The Investment Agreements state, in part, that IC was to use the invested funds specifically for the fixing and flipping of the property located at 3985 Fairfield Road, Slinger, Wisconsin 53086. The Investment Agreements guaranteed each investor the return of their principal plus a return on investment of either 10% or 20% in 8 months.

15. Records subpoenaed from Navy Federal Credit Union (NFCU) show each of these investors transferred funds to NFCU account ending 5223 in the name of IC (IC account ending 5223). The account application and signature card for IC account ending 5223, dated April 15, 2022, list Nantomah as the 100% owner of IC and the sole signor on the account. The investor transfers, which match the amounts in each investor's Investment Agreement, are as follows:

a. Investor 1 transferred $50,000 on May 29, 2023.

b. Investor 2 transferred $100,000 on May 30, 2023.

c. Investor 3 transferred $80,000 on June 5, 2023.

d. Investor 4 transferred $25,000 on June 5, 2023, $25,000 on June 7, 2023, and $10,000 on June 12, 2023, for a total of $60,000.

16. On July 14, 2025, AxePoint Law Attorney Kate Goodhart confirmed that to date, Investor 1, Investor 2, Investor 3, and Investor 4 have not received any return on investment or any return of their principal, which was guaranteed to be paid in 8 months.

17. An analysis of IC account ending 5223 shows no real-estate related transactions involving 3985 Fairfield Road, Slinger, Wisconsin 53086. Instead, between May 31, 2023 and June 8, 2023, $270,000, primarily consisting of these investors' funds, was transferred via check and cashier's check from IC account ending 5223 to IC's account ending 2175 at Landmark Credit Union (IC account ending 2175). Records subpoenaed from Landmark Credit Union show the certificate of beneficial owners for IC account ending 2175, dated March 5, 2022, list Nantomah as the account owner with a 99% controlling interest. A minor named Nana Nantomah is also listed as a signor on the account with a 1% controlling interest.

18. The funds transferred to IC account ending 2175 were used for a variety of expenditures including what appears to be personal expenses, cash withdrawals, large American Express credit card bill payments for what appear to be lavish travel and other personal expenses, and to pay back previous investors.

19. Washington County records show that neither Nantomah nor any of his businesses have ever held an ownership interest in 3985 Fairfield Road, Slinger, Wisconsin 53086. Washington County warranty deed records show that Jeffrey and Karoline Rehm jointly owned the property with Spencer and Sharon Nygaard from March 18, 2005, to September 14, 2023, at which point they sold it to the Collison Revocable Trust. As detailed below, this Trust is not associated with Nantomah or any of his businesses.

20. On July 16, 2025, a case agent interviewed Jeffrey Rehm. Rehm stated that he previously owned and lived at the property located at 3985 Fairfield Road in Slinger, WI. Rehm stated that he signed a contract with a man with initials V.M. to sell the house sometime in May, June, or July 2023. V.M. was looking for investors to help buy the property and a man named Joseph was one of the potential investors. V.M. had three contractors bid on work that was needed

at the Slinger house. Joseph was one of the contractors who was allowed to walk through the house. Over the course of a couple of days there were a lot of people in and out of the house. Joseph went to the Slinger house twice. The first time he was alone and the second time he was with another guy and they toured the house. Joseph backed out of the investment and V.M. could not find another investor, so Rehm moved on from the contract. Rehm never received any funds from V.M. or Joseph for the purchase of 3985 Fairfield Road in Slinger, Wisconsin. Rehm hired a realtor and quickly sold the house to a family trust with absolutely no association to V.M. or Joseph.

21. On April 29, 2025, a case agent surveilled publicly available information on the Instagram account theblackmentor_ with profile name DrJoseph James Nantomah. The case agent used specialized software to video record the posts viewed. As part of the surveillance, the case agent recorded two video posts, one from June 2, 2023, and one from June 3, 2023. These videos show Nantomah and Investor 1[1] discussing and visiting a fix-and-flip investment property. The following summarizes information and statements from these videos:

a. The first video was posted on June 2, 2023. This video shows Nantomah and Investor 1 standing in a building and talking. The following statements were made in part during the video:

**INVESTOR 1:** I invested in the deal. So, you you don't want to let deals go by like that.

**NANTOMAH:** Yeah, so that deal that we are talking about…the one in Slinger that I um uh got for 665. We'll put in 35…or is it 25 to fix it, and we're selling 850. He's on that deal.

[1] The case agents reviewed Investor 1's driver's license photograph and confirmed this individual is Investor 1.

**INVESTOR 1:** Right

**NANTOMAH:** And uh we're gonna be finishing that deal. That is gonna start this month in June and I wanted him to come and see it for himself.

***BREAK***

**NANTOMAH:** So we're going to see the deal. We're going in there. Everybody is waiting there. My contractor everybody is gonna be there. We'll probably do a live there and you can tell them your experience…You got anything you want to say before I go?

**INVESTOR 1:** Let's go people. Let's go make the money.

b. The second video was posted on June 3, 2023. This video shows Nantomah and Investor 1 walking around the exterior of 3985 Fairfield Road, Slinger, Wisconsin 53086[2] and then entering the house and walking around the interior. The post reads, "Last chance to be on this amazing deal we closing this June. Property on contract for $665,000 / Repairs $35,000 / Selling or ARV on paper is $831,000 might be more / Profit $131,000 before closing. DM the word DEAL or email Info@investorscapitalllc.net." Info@investorscapitalllc.net is the Subject Account.

22. On October 9, 2024, Investor 1 was interviewed by the SEC pursuant to their investigation. The following is a partial summary of the statements Investor 1 made during the interview:

a. Investor 1 initially saw Nantomah on Instagram and reached out to him. Investor 1 believed that Nantomah was a reputable person. So, he told him that he would

[2] On July 17, 2025, a case agent showed Jeffrey Rehm this video and Rehm confirmed that the property in the video is his previous property at 3985 Fairfield Road, Slinger, Wisconsin 53086. Rehm also confirmed that the white male shaking Nantomah's hand inside the house is Rehm.

love to talk with him as he was thinking of investing in real estate and was looking for a mentor. Nantomah told Investor 1 that he couldn't be his mentor at that time and instead sent him an invitation for the Wealth Flow (WF) conference in Milwaukee. Since Investor 1 had another commitment, he didn't attend the WF conference.

b. A year later, Nantomah travelled to Baltimore. So, Investor 1 took the opportunity to meet him in person and, they had a one-on-one meeting. During the meeting, Nantomah had called someone over the phone and asked the person to prequalify Investor 1 for a loan. Nantomah gave Investor 1 a paper detailing this prequalification, which was for a $2 million loan. Nantomah had asked Investor 1 how much money he had. When Nantomah heard Investor 1 had $50,000 to invest, he told Investor 1 that it wasn't enough to invest on his own and recommended that he invest with Investors Capital, LLC (IC) to build up his portfolio. A week later, Nantomah sent Investor 1 what's app messages with details of an investment property located at 3985 Fairfield Rd, Slinger, Wisconsin. Nantomah wanted Investor 1 to invest in the property with him.

c. Nantomah told Investor 1 that investing with IC was a great investment opportunity because you are buying, fixing, and then flipping properties for profit. Investor 1 didn't have any reason to doubt him. When Investor 1 initially received the investment contract from Nantomah, he shared it with his attorney who suggested a few changes. When approached with these changes, Nantomah became mad.

d. On May 25, 2023, Investor 1 signed an investment agreement with IC and wired $50,000 from his Navy Federal Credit Union (NFCU) account. Investor 1 retained a receipt of this payment. The terms of the agreement stated that Investor 1 would receive a 20% return on his investment to be repaid in eight months. Nantomah told Investor 1 that

he was going to use the money invested with IC to fix up and flip the property located at 3985 Fairfield Road, Slinger, Wisconsin. Investor 1 said that at the time he didn't know that other people had also invested in the property. After the investment matured and his money came due, Investor 1 found out that Doctor N., a Texan doctor, had also invested in the same property.

e. Investor 1 said that he has a very retentive memory, and he vividly recalled his visit to Milwaukee to view the investment property located at 3985 Fairfield Rd, Slinger, Wisconsin. Investor 1 flew to Milwaukee from Maryland. Once on the ground, he rode in Nantomah's car to the property. Investor 1 recalled that the reason why the property was being sold was because a white man and his wife were retiring. According to Nantomah, the husband told Nantomah to sell their property because they were going on a cruise. When they arrived at the property, they were met by a white man and his wife who acted like the owners of the property and appeared to be in their mid-60's. In the house, there was live video set up to record the visit. During this walk-through, Nantomah had asked Investor 1 about his reaction to the property. The video recording of their discussion was then posted to Nantomah's Instagram page.

f. Investor 1 was subsequently contacted by P.A. via What's app when it was discovered that they had both invested in the same property. P.A., an investor out of New York, had seen the video of Nantomah and Investor 1 and, based on that video, decided to invest. P.A. saw that Investor 1 was a preacher, which also influenced his decision to invest. When Investor 1 heard this, he said that it pained his heart because he was unintentionally involved in someone else investing with Nantomah.

g. Investor 1 discussed communications he had with Nantomah when his contract came due on January 2, 2024. Investor 1 had called and texted Nantomah but all he received were excuses why Nantomah couldn't return his funds. For example, Nantomah said that his NFCU account had been closed because he was doing so many transactions, which caused the initial delay in repaying Investor 1. In February 2024, Investor 1 reached out to Nantomah who told him that he (Nantomah) was going to Vegas the week of the Superbowl. He told Investor 1 that he would call him in a week and at that time repay his funds with interest. On March 31, 2024, Easter Sunday, Nantomah called Investor 1 at around 8:00 p.m. During that phone call, Nantomah told Investor 1 that he saw a house in Florida, and it was such a good deal that "Even his enemy would have advised him to buy the property." Allegedly, Nantomah had invested Investor 1's money in this house. Nantomah told him that the family wanted to sell the property and they needed cash. Instead of paying Investor 1 back he reinvested his funds. Nantomah told Investor 1 to give him a call in one month and at that time, he would repay his money. When Investor 1 called him the following month, Nantomah wouldn't answer the call. Investor 1 subsequently tried reaching Nantomah over the next several months but, Nantomah didn't pick up. Investor 1 called Nantomah for the last time on June 19, 2024. When he couldn't reach Nantomah, he filed the lawsuit the following day through his attorney, Goodhart.

h. Investor 1 explained that he was not okay with Nantomah's practices including the investment of his funds in other properties. Nantomah never repaid Investor 1.

23. On January 4, 2024, Investor 2 was interviewed by the WI-DFI pursuant to their investigation. The following is a partial summary of the statements Investor 2 made during the interview:

a. Investor 2 learned about Nantomah when someone Investor 2 knows on Instagram posted about him. The post was about a property Nantomah had. Nantomah was looking for people to invest in the property with him and he talked about how much you could make. Investor 2 reached out to Nantomah in May, and Nantomah told Investor 2 about the property in Slinger. Investor 2 and Nantomah scheduled a call during which Nantomah shared the details of the property and the investment. Nantomah said multiple people would invest together in the property. Nantomah charged Investor 2 $500 for the hour-long call.

b. Investor 2 decided to invest $100,000 in the Slinger property. Investor 2 paid Nantomah $100,000 on May 30th[3]. Nantomah gave Investor 2 paperwork for the property investment and the agreement stated that Investor 2 would receive a 10% return on investment in eight months. Nantomah told Investor 2 that the turnaround to sell a property will usually be about six months max but added two months to the agreement to provide a buffer period. However, the agreement to pay back Investor 2's investment in eight months was not contingent on the sale of the property. Nantomah told Investor 2 he/she would be paid back by January 2.

c. Investor 2 believed that there were three investors in the Slinger property: Investor 2, Nantomah, and another individual. The other individual was a male pastor in Maryland, but Investor 2 could not recall his name. Investor 2 believed they were investing

[3] Based on financial records subpoenaed from Navy Federal Credit Union, this transaction occurred on May 30, 2023.

their funds to purchase the property, renovate it, and then put it back on the market to be sold. Investor 2 believed his/her funds were to be used for the purchase of the property, while Nantomah's funds were to be used for the purchase of the property and the renovations. Investor 2 would not have consented for his/her $100,000 investment to be used for anything besides the purchase of this property. The property was to be bought in the name of Investors Capital.

d. On June 7, Investor 2 went to Wisconsin to see the property. Nantomah took Investor 2 to the property with his contractor and the couple who owned it. The owners were still living there at the time and showed them around. They toured the property and talked about how much it was going to cost.

e. In approximately December, Investor 2 had researched the Slinger property and discovered that it was sold in September and that Nantomah was neither the seller nor buyer. Investor 2 wrote Nantomah an email[4] asking about the status of the investment property and if it had sold. Nantomah told Investor 2 he would tell him/her when it's ready. Investor 2 questioned Nantomah about why they don't know the status in December when the investment return was due January 2. Nantomah said if Investor 2 did not like his response, he/she can go ahead and sue or wait. He said he would tell Investor 2 when he is ready. Nantomah said he will pay Investor 2 his/her money, but Investor 2 will not be the one to make him pay. This was the last time Investor 2 spoke with Nantomah.

f. Investor 2 never received any funds from Nantomah.

[4] Records Investor 2 provided to WI-DFI include three emails between Investor 2 and the Subject Account. Two of these email exchanges were in December 2023 and involve Investor 2 inquiring with Nantomah about Investor 2's investment. Therefore, there is probable cause that the email Investor 2 discussed in the interview involved the Subject Account.

24. Records Investor 2 provided to the WI-DFI include three email exchanges between Investor 2 and the Subject Account in 2023. Each email sent from the Subject Account has Joseph Nantomah and Investors Capital LLC on the signature line. For example, Investor 2 received an email from the Subject Account on May 23, 2023. The subject line of the email reads, "REAL ESTATE CONTRACT" and there is a PDF file attached. The body of the email reads, "Please find the attached contract, read, sign the last page and send it back for notary signing." The signature line of the email contains the name of Joseph Nantomah, business name of Investors Capital LLC, address of 790 N Milwaukee Street Milwaukee WI 53202, and office line of +1-262-226-7378. The PDF file attached to this email is a copy of an investment agreement Investor 2 entered with Investors Capital LLC. This is the investment contract calling for Investor 2 to invest $100,000 to fix and flip 3985 Fairfield Road, Slinger, Wisconsin 53086, in return for a 10% return on investment in eight months.

25. On March 22, 2024, Investor 3 was interviewed by the WI-DFI pursuant to their investigation. The following is a partial summary of the statements Investor 3 made during the interview:

a. Investor 3 learned about Nantomah through Daddy Freeze's Instagram Live show. Nantomah was frequently on Daddy Freeze's live shows that Investor 3 watched. Nantomah paid Daddy Freeze to be on these shows.

b. In June 2023, after Investor 3 watched several videos Nantomah posted to his Instagram page about a property investment in Slinger, Investor 3 direct messaged Nantomah on Instagram about the property. Subsequently, Nantomah called Investor 3, and they discussed the property investment. The property was located at 3985 Fairfield Rd, Slinger, Wisconsin. Nantomah said he was going to sell the property in six months,

but he would put seven months in the contract and the return on investment would be 20%. Investor 3 agreed to invest and Nantomah sent him/her the contract on WhatsApp. Investor 3 reviewed the contract, signed it, and sent it back to Nantomah. Then, Investor 3 wire transferred $80,000 to Nantomah for the investment. The investment plus the return on investment, totaling $96,000, was due to Investor 3 on February 5, 2024. Investor 3 believed his/her investment in 3985 Fairfield Rd, Slinger, Wisconsin, was to be used for the property to be repaired and resold. Investor 3 would not have consented in any way for his/her funds to be used for any other purpose than the purchase, rehabilitation, or sale of this property.

c. On February 5, 2024, at noon, Investor 3 contacted Nantomah and Nantomah asked him/her to forward him the contract. Investor 3 forwarded Nantomah the contract, said it is due, and asked when Nantomah would be paying. Nantomah asked Investor 3 to validate his/her account, which he/she did. Nantomah said he was working on the transaction and would get back to Investor 3. Nantomah never completed the transaction. Investor 3 followed up with Nantomah multiple times regarding the payment and Nantomah always blamed the bank for having issues.

d. The last time Investor 3 spoke with Nantomah about his overdue investment was during a video call they had. Nantomah was showing Investor 3 that he was in Chase Bank and said the banker told him it would take five to seven working days to transfer the funds. Immediately after Nantomah said this, the banker said that was not what he/she said. Nantomah quickly cut in and said he would call back. Seven days later, Investor 3 tried to contact Nantomah about the funds, but Nantomah did not respond. Investor 3 sent Nantomah emails and called him and Nantomah did nothing.

26. Records Investor 3 provided to the WI-DFI show a screenshot of an email from the Subject Account, dated June 4, 2023. The subject line of the email reads, "REAL ESTATE CONTRACT" and there is a PDF file attached. The body of the email reads, "Please find the attached contract, read, sign the last page and send it back to us for notary signing." The signature line of the email contains the name of Joseph Nantomah, business name of Investors Capital LLC, address of 790 N Milwaukee Street Milwaukee WI 53202, and office line of +1-262-226-7378. Investor 3 also provided a copy of an investment agreement he/she entered with Investors Capital LLC, which bears the date of June 4, 2023, on the signature line for Investor 3. This is the same date of the email from the Subject Account. This is the investment contract calling for Investor 3 to invest $80,000 to fix and flip 3985 Fairfield Road, Slinger, Wisconsin 53086, in return for a 20% return on investment in eight months.

**Conclusion**

27. Based on the above, including that Nantomah posted the Subject Account as the account to contact with interest about investment on Instagram and that Nantomah sent investment contracts to investors for the Slinger property using that account, I believe there is probable cause that evidence of Nantomah's investment scheme will be found in the records maintained by Google for the Subject Account.

**Google Records**

28. Email account records were received from Google on July 16, 2025. These records show that email account info@investorscapitalllc.net, the Subject Account, is a Google account created on April 25, 2022. This email account was created in the name of Joseph Nantomah and has an account recovery SMS of 12622267378. The Subject Account has the following services:

Dasher Policy, Ga Plus, Google Apps Administrator Control Panel, Gmail, Google Hangouts, Google Chat, Google Calendar, Google Docs, Google Drive, Google Sites, Google Voice, Google Chrome Sync, Google Vault, Apps Script, Topaz, Classroom, Google Keep, Jamboard Web and Mobile Apps, Google Tasks Service, Course Kit, Meet, Contacts, Plus Enterprise, Google Groups, YouTube, Android, Location History, G1 Phone Backup, Google Domains, Google Payments, Pikeplace User, and Google My Maps.

## BACKGROUND CONCERNING GOOGLE[5]

29. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

30. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

---

[5] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

31. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account. Enterprises, such as businesses and educational institutions, may also establish Google Accounts that can be accessed using an email address at the enterprise's domain (e.g. employee@company.com).

32. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

33. Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

34. Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them.

Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

35. Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals. A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

36. Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

37. Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text

documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

38. Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep notes are stored indefinitely, unless the user deletes them.

39. Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

40. Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

41. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

42. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

43. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects

to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

44. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

45. Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months

unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

46. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

47. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

48. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

49. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

51. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

52. Based on the foregoing, I request that the Court issue the proposed search warrant.

53. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

This warrant applies to information associated with the following accounts, which are stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043:

1. **info@investorscapitalllc.net**

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I. Information to be disclosed by Google, LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Google, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for the account or identifier listed in Attachment A **for the time period of April 25, 2022, through the date of this warrant.**

a. The contents of all emails associated with the accounts, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email, the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c. The types of service utilized;

d. Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

e. Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

f. The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

g. The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

h. The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

i. All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history;

j. All Google Voice records associated with the account, including: forwarding and other associated telephone numbers, connection records; call detail records; SMS and MMS messages, including draft and deleted messages; voicemails, including deleted voicemails; user settings; and all associated logs, including access logs, IP addresses, location data, timestamps, and change history;

k. All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

l. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

m. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

Google is hereby ordered to disclose the above information to the government within 14 days of the issuance of the warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) involving Joseph Nantomah, Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC, from April 25, 2022, through the date of this warrant, for the Subject Account identified in Attachment A, information, including records and communications, pertaining to the following matters:

1. Offering, soliciting, or discussing of investment opportunities;
2. Obtaining, secreting, transferring, and/or concealment of money and other assets, and the expenditure of money;
3. Personal and business accounting books and records: ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all

sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

4. Personal and business financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates, US Treasury notes or bills, cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;
5. Business origination and creation documentation;
6. Titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, wills, inheritance records, gift records, trust records, records for the purchase of precious metals, and other investment records;
7. Client records including names, address and telephone books, work orders, notes, investment agreements, contracts, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

8. Online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;
9. All evidence of who created, used, owned or controlled the Subject Account, including, records that help reveal the identity and whereabouts of such person(s).
10. Evidence indicating how and when the Subject Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owners.
11. Evidence indicating the Subject Account owners' state of mind as it relates to the crime under investigation.
12. The identity of the person(s) who communicated with the Subject Account about matters relating to the above-mentioned violations, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.